IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EFRAIN REYNAGA,

        Plaintiff,

    v.

ROSEBURG FOREST PRODUCTS,

        Defendant.

_____

Civ. No. 6:11-cv-6282-MC

OPINION AND ORDER

MCSHANE, Judge:

Plaintiff brings this action seeking damages and attorney's fees for alleged violation of his rights under (1) 42 U.S.C. § 2000e *et seq*. (Title VII), (2) 42 U.S.C. § 1981, and (3) ORS § 659A.030(1)(a) & (b). Plaintiff alleges that he was subjected to a hostile work environment and adverse employment actions because of his race or national origin, and terminated in retaliation for his complaints of discrimination. Defendant filed this motion for summary judgment. This Court has jurisdiction under 28 U.S.C. §§ 1331 & 1367. Upon review, defendant's motion for summary judgment (#37) is GRANTED.

## PROCEDURAL AND FACTUAL BACKGROUND

Defendant hired plaintiff as a millwright in November, 2004. Decl. of Efrain Reynaga ¶ 2, ECF No. 45. On October 14, 2009, plaintiff had a confrontation with a lead millwright, Timothy Branaugh, over who should work on a particular piece of machinery. Pl.'s First Am. Compl. ¶ 28, ECF No. 22. On October 15, 2009, Plaintiff's son, Richard Reynaga, who also worked for defendant, talked with maintenance superintendent Terry Turner about his father's problems with Timothy Branaugh. *Id*. at ¶ 29; Decl. of Dan Clark 15–16, ECF No. 37-2. On October 17, 2009, a dispute/altercation arose between Richard Reynaga and Branaugh relating to

seniority and performance of a certain welding job. Mem. in Supp. of Def.'s Mot. Summ. J. 2, ECF No. 37-1. Defendant subsequently investigated this dispute/altercation. Decl. of Dan Clark 3, ECF No. 37-2. Plaintiff participated in the investigation to support his son, and while present at an associated meeting, also complained to management about his ongoing conflict with Branaugh. Id.; Mem. in Supp. of Def.'s Mot. Summ. J. 3, ECF No. 37-1.[1] The parties contest whether plaintiff complained that Branaugh's harassment was racial in nature. In response to plaintiff's complaint, defendant's managing personnel (Turner, Westbrook, and Albertus) met with and verbally reprimanded Branaugh. Decl. of Terry Turner 2, ECF No. 37-5.

Plaintiff subsequently filed a written complaint alleging racial harassment with defendant on December 3, 2009. Decl. of Marianne Dugan, ECF No. 47-1. In response to this complaint, Defendant hired Vigilant, a company specializing in employment relations for timber companies. Decl. of Jon McAmis 2, ECF No. 37-5. Vigilant was hired to investigate the allegations underlying the complaint and interview the pertinent parties. Id. Vigilant interviewed plaintiff on December 10, 2009. Decl. of Kenneth Roelofs 2, ECF No. 37-5. In that interview, plaintiff revealed a racial statement[2] made by Tim Branaugh and indicated that he didn't want to work with Branaugh. In response, defendant scheduled plaintiff and Branaugh in a way that kept them separated in the work place as much as possible. Decl. of Jon McAmis 2, ECF No. 37-5.

Vigilant unsuccessfully attempted to hold a second interview with plaintiff on December 21, 2009. Jon McAmis Letter, ECF No. 37-5. The parties contest plaintiff's willingness to be interviewed a second time. Vigilant contacted plaintiff seeking a second interview on December 21, 2009. Initially, plaintiff refused to be interviewed without an attorney. Decl. of Efrain

---

[1] The parties appear to dispute the exact date of this meeting. For example, plaintiff claims that he verbally complained to his supervisors (Turner, Westbrook, and Albertus) about Branaugh's harassment on October 19, 2009. Pl.'s First Am. Compl. ¶ 31, ECF No. 22; Decl. of Efrain Reynaga ¶ 48, ECF No. 45.

[2] According to plaintiff, Branaugh stated "I'm a true believer that we should close the borders to keep motherf***ers like you from coming up here and killing our elk." Pl.'s First Am. Compl. ¶ 25, ECF No. 22.

Reynaga ¶ 63, ECF No. 45. Per company policy, defendant did not allow attorneys to be involved in plant-level investigations. Plaintiff claims that he subsequently informed defendant that he was willing to do the second interview without an attorney. *Id*. at ¶ 64.

On January 9, 2010, plaintiff and his son arrived for their scheduled shift. Upon discovering that Branaugh was on-site that day, they immediately departed from the premises. Plaintiff's son notified defendant that they had left, stating "Efrain and I Richard Reynaga . . . [a]rrived for work to find Timm B [sic] here! We will not work in a hostile work environment. We will report to our shift on Wednesday Jan, 13, 2010 . . . [u]nless we hear otherwise." Decl. of Efrain Reynaga, 9–10, ECF No. 45. On January 13, 2010, plaintiff and plaintiff's son met with defendant's Human Resources and Safety Supervisor, Dan Johnson, to discuss January 9, 2010. Johnson told plaintiff and plaintiff's son that "Branaugh would be off-shift . . . as much as possible, but that there were some days where Branaugh and the Reynagas would be at the sawmill at the same time." Mem. in Supp. of Def.'s Mot. Summ. J. 5, ECF No. 37-1; Decl. of Daniel Johnson 3, ECF No. 37-5. Johnson also informed plaintiff that "Branaugh had been told to stay away from [plaintiff and plaintiff's son] and to have no contact with them unless a work necessity or emergency arose" and instructed plaintiff to do the same. *Id*. at 2. After this conversation, Johnson asked plaintiff and plaintiff's son if they would complete their shifts with Branaugh on-site; they said they would not. *Id*. Johnson thereafter suspended plaintiff and plaintiff's son "pending the conclusion of [Vigilant's] investigation due to their refusal to work." *Id*. at 6.

On January 18, 2010, plaintiff received a letter of termination from defendant. *Id*. at 4. The letter explained that plaintiff was terminated "for walking off the job on January 9, 2010, and refusing to work on January 13, 2010." *Id*.; Decl. of Daniel Johnson 3, ECF No. 37-5.

Plaintiff received a second letter related to his termination on the same date, which discussed plaintiff's "lack of cooperation with the investigation conducted by [Vigilant]." Mem. in Supp. of Def.'s Mot. Summ. J. 6, ECF No. 37-1; Decl. of Daniel Johnson 5, ECF No. 37-5. The second letter informed plaintiff that Vigilant's investigation suffered from the lack of a second interview, but that the investigation nonetheless revealed "no evidence of a severe or pervasive hostile work environment." Decl. of Daniel Johnson 5, ECF No. 37-5. The investigation did, however, reveal "some personnel issues . . . which [defendant] wanted to address, but Plaintiff had been unwilling to meet and ignored phone calls." *Id.*

## STANDARD OF REVIEW

The court must grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). This Court views the evidence in the light most favorable to the non-moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995) (citing *Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994)). If the moving party shows that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see* FED. R. CIV. P. (56)(c).

## DISCUSSION

Defendant contends that there is insufficient evidence to show that: (1) plaintiff was subjected to a hostile work environment in violation of Title VII and § 1981; (2) plaintiff was subjected to disparate treatment in violation of Title VII and § 1981; (3) plaintiff was terminated

and subjected to disparate treatment in retaliation for his discrimination complaints in violation of Title VII and § 1981; and (4) plaintiff was discriminated against because of his race in violation of ORS § 659A.030(1)(a) and (b).

## I. Hostile Work Environment, Title VII & § 1981

Plaintiff alleges that he was subjected to a racially hostile work environment in violation of Title VII and § 1981. Pl.'s First Am. Compl. ¶ 59, ECF No. 22. Title VII and § 1981 establish a two-part test[3] for determining employer liability in the context of a hostile work environment claim.[4] First, plaintiff must establish a prima facie hostile work environment claim. *See, e.g.*, *Vasquez*, 349 F.3d at 642. Second, if plaintiff is successful in establishing a prima facia claim, then this Court must assess whether the employer is liable either vicariously or through negligence.[5]

## A. Prima Facie Hostile Work Environment Claim

A prima facie hostile work environment claim requires a plaintiff to show that "(1) he was subjected to verbal or physical conduct of a racial . . . nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez*, 349 F.3d at 642 (citing *Gregory v. Widnall*, 153 F.3d 1071, 1074 (9th Cir. 1998)). Because neither party

---

[3] *See, e.g.*, *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1462–63 (9th Cir. 1994) (internal quotation marks omitted) (citing *Ellison v. Brady*, 924 F.2d 872, 879, 881–83 (9th Cir. 1991)). Although *Steiner* involved a Title VII sexually hostile work environment claim rather than a race-based claim, the Ninth Circuit recognizes that the "elements to prove a hostile work environment are the same for both racial harassment and sexual harassment." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003).

[4] The Ninth Circuit has recognized that "th[e] legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 797 (9th Cir. 2003) (citations omitted); *see also* *E.E.O.C. v. Inland Marine Indus.*, 729 F.2d 1229, 1233 n.7 (9th Cir. 1984) ("A plaintiff must meet the same standards in proving a § 1981 claim that he must meet in establishing a . . . claim under Title VII . . . .").

[5] *See, e.g.*, *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2454 (2013) (defining supervisor for the purposes of vicarious liability under Title VII); *Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998) (finding that an employer may be held liable through negligence under Title VII); *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864, 875 (9th Cir. 2001) (citations omitted) (internal quotation marks omitted) ("An employer is liable for the hostile work environment created by a co-worker unless the employer . . . take[s] adequate remedial measures in order to avoid liability.").

contests that plaintiff met his burden under the first two prongs, this Court's inquiry will focus on the third prong.

In determining whether conduct rises to the level of severe and pervasive, this Court focuses on the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher,* 524 U.S. at 787–88 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)). Defendant contends that plaintiff's allegations, collectively, do not meet this "severe or pervasive" threshold.

This Court first evaluates the record for explicit racial and national origin comments alleged to have been made by Branaugh. These alleged comments are as follows: (1) once used the term "ni\*\*ers" in front of the shift supervisor, Pl.'s First Am. Compl. ¶ 24, ECF No. 22; (2) told plaintiff in September 2009 that "I'm a true believe[r] that we should close the borders to keep motherf\*\*\*ers like you from coming up here and killing our elk," *id.* at ¶ 25; (3) on January 4, 2010, left a hard-copy of an email in the break room which stated that President Obama was an illegal alien and complained that "our borders are like sieves," *id.* at ¶ 37; (4) asked "[a]re all Mexican women fat?", Decl. of Efrain Reynaga ¶ 11, ECF No. 45; (5) called Indian women, a group which includes plaintiff's wife, "nasty fat squaws", *id.* at ¶ 12; (6) stated in September 2009 that "[m]inorities are taking over the country", *id.* at ¶ 13;[6] and (7) referred to Arab persons as "rugheads", *id.* at 3.

Defendant contends that only Branaugh's alleged remarks about closing the borders (#2) and Mexican women (#4) should be considered.[7] This Court recognizes that the use of code

---

[6] Plaintiff generally alleges that similar comments were made in the maintenance office and over the radio on other undated occasions. Decl. of Efrain Reynaga 2–3, ECF No. 45.
[7] Defendant contends that these additional allegations brought in plaintiff's response to summary judgment should be excluded under *Foster v. Arcata Associates*, 772 F.2d 1453, 1462 (9th Cir. 1985). However, in *Kennedy v. Allied*

words can violate Title VII. *See, e.g.*, *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1116–17

(9th Cir. 2004) (citing *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996)).

Branaugh's references to the borders being "like sieves" (#3) and "[m]inorities . . . taking over

the country" (#6) are considered because "[a] reasonable jury could find that statements like

[these] . . . send a clear message and carry the distinct tone of racial motivations and

implications." *McGinest*, 360 F.3d at 1117 (quoting *Aman*, 85 F.3d at 1083). This is particularly

clear in light of Branaugh's comment that the "borders should be closed to keep [plaintiff]" from

hunting American elk (#2). As to the remaining allegations, defendant interprets *McGinest*, to

support its proposition that this Court should not consider racially charged statements "not

directed at members of the plaintiff's race." Def.'s Rep. to Pl.'s Resp. to Def.'s Mot. Summ. J. 6,

ECF No. 51.

      In *McGinest*, plaintiff, an African American male, alleged racial discrimination by

coworkers and a supervisor. Of this alleged discrimination, the Ninth Circuit assessed the

relevance of racial comments (e.g., "Aunt Jemima"[8]) directed at plaintiff's white

coworker/friend in plaintiff's presence. The Ninth Circuit held that the district court erred in

ignoring these racial comments and found that "a plaintiff may establish a violation of Title VII,

even if such hostility was not directly targeted at the plaintiff," and "[h]ostile conduct that

attempts to sever or punish" interracial relationships may contribute to the pervasion of racial

hostility in the workplace. *McGinest*, 360 F.3d at 1117. Defendant interprets these holdings as

applying only to employee-employee relationships. Defendant's argument is unpersuasive.

---

*Mut. Ins. Co.*, 952 F.2d 262, 266-67 (9th Cir. 1991), the Ninth Circuit concluded that *Foster* "does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition. Plaintiff's subsequent affidavit is not "sham testimony" that "flatly contradicts earlier testimony" and is considered. *See id.* at 267.

[8] "'Aunt Jemima' is a racial insult, connoting laziness and servitude." *McGinest*, 360 F.3d at 1110.

The Ninth Court's consideration of associational discrimination was not limited to coworkers. Rather, the Court explicitly found that the plaintiff "was harassed for making friendships that crossed racial lines." *Id*. at 1118. Because "hostile conduct that attempts to sever or punish" interracial friendships is considered, *see, e.g.*, *id*, this Court also considers hostile conduct directed at punishing interracial marriage, i.e., Branaugh's comment about Native Americans (#5). *Accord Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1199 (7th Cir. 1992) (considering alleged discrimination involving interracial marriage). As to Branaugh's alleged use of the term "ni**er" (#1) and "rughead" (#7), neither statement meets the *McGinest* associational discrimination threshold because plaintiff does not allege any relevant relationship. However, this Court still has discretion to consider both statements to the extent that they reflect a working atmosphere polluted with racial tension.[9]

This Court next evaluates the record for alleged hostile conduct directed toward plaintiff that does not explicitly reference race or national origin. Plaintiff alleges that: (8) he was "made to go up and down stairs with [a] broken leg" when others were allowed to stay home with similar injuries, Pl.'s First Am. Compl. ¶ 45, ECF No. 22; (9) he was "denied a company email account when other mill workers were given one," *Id*. at ¶ 42; (10) Branaugh belittled plaintiff in front of an apprentice by commenting that plaintiff was "a big boy" and had a "little, tiny

---

[9] For example, in *Woods v. Graphic Communications*, 925 F.2d 1195, 1197-98 (9th Cir. 1991), plaintiff, an African American man, alleged a work environment polluted with "racial jokes, cartoons, comments and other forms of hostility directed at almost every conceivable racial and ethnic group, particularly Blacks, were common at the plant." In assessing plaintiff's hostile work environment claim, the Ninth Circuit found that the "atmosphere of the plant was unquestionably polluted" and "[e]ven if only a few of [the supervisors'] acts were directed at Woods personally, they were far from isolated incidents." *Woods*, 925 F.2d at 1201-02; *See also Davis v. Team Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008) (citations omitted) ("Offensive comments do not all need to be made directly to an employee for a work environment to be considered hostile."); *Johnson v. Riverside Healthcare System*, LP, 534 F.3d 1116, 1123 (9th Cir. 2008) ("discriminatory conduct directed at an individual other than the plaintiff may be relevant to a hostile work environment claim."); *Monteiro v. Tempe Union High School Dist.*, 158 F.3d 1022, 1033 (9th Cir. 1998) ("racist attacks need not be directed at the complainant in order to create a hostile educational environment.").

dick,"[10] Mem. in Supp. of Def.'s Mot. Summ. J. 19, ECF No. 37-1; (11) Branaugh commented on plaintiff's work by stating that plaintiff "just fu**ing dinks around and dinks around and fu**s around and fu**s around," Decl. of Efrain Reynaga 5, ECF No. 45; (12) on November 12, 2008, the "mill" unnecessarily broke his lock during the course of a locker search for drugs by a police canine unit, Pl.'s First Am. Compl. ¶ 45, ECF No. 22; (13) plaintiff and plaintiff's son were generally assigned the "harder and dirtier jobs," Decl. of Efrain Reynaga 4, ECF No. 45;[11] (14) on October 14, 2009, Branaugh commented that plaintiff was "slow" in rebuilding an accumulator, *id*. at 5; (15) on December 20, 2009, the "company put 16 millwrights back to full-time work (from part-time) but did not do so for plaintiff and his son," *id*. at 6; and (16) on January 13, 2010, Branaugh revved his engine to tease plaintiff and plaintiff's son, Decl. of Dan Clark 13, ECF No. 37-2.

In assessing all of the alleged conduct above, it is important to note that Title VII is "not a code of general civility." *Faragher*, 524 U.S. at 778. Nor does Title VII protect against the sporadic use of abusive language, jokes, and occasional teasing. *See E.E.O.C.*, 621 F.3d at 998. To meet the severe and pervasive factor, "[t]he working environment must both subjectively and objectively be perceived as abusive." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000). Defendant does not contest plaintiff's subjective perception of abuse. As to the objective inquiry, "that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998).

---

[10] Plaintiff also alleges that Branuagh, on a different occasion, stated that plaintiff "needs all the help he can get." Decl. of Dan Clark 20, ECF No. 37-2.

[11] For example, plaintiff stated that over Thanksgiving weekend of 2009, he and his son were assigned to "work at the powerhouse while the five white" millwrights got to stay at the better job. Decl. of Efrain Reynaga 4–5, ECF No. 45.

Plaintiff and Branaugh were clearly foes by the end of 2008, if not earlier.[12] *See* Decl. of Efrain Reynaga 2, ECF No. 45. Between 2006 and January 2010, Plaintiff and Branaugh had a series of altercations where foul language was exchanged with their "fingers at each other's nose[s]." Decl. of Dan Clark 14, ECF No. 37-2. Although plaintiff alleges multiple violative statements by Branuagh, *see supra* (#1–7, 10–11, & 14), the brunt of s racial allegations directed at plaintiff stem from September 2009 onward, *see supra* (#2, 3, & 6). Of all plaintiff's allegations (#1–7, 10–11, & 14), "while offensive and inappropriate," they "did not so pollute the workplace that it altered the conditions of [plaintiff's] employment." *Manatt*, 339 F.3d at 798. Rather, under Ninth Circuit case law, these comments "generally fall into the 'simple teasing' and 'offhand' comments' category of non-actionable discrimination. For example, in *Manatt*, a bank employee of Chinese descent brought a racially hostile work environment claim alleging seven explicit racial comments/behaviors including: (1) plaintiff overheard a co-worker say to supervisor "I am not a China man, I'm not like China man with their eyes like that"; (2) a supervisor told plaintiff "I've had the word kind of trouble with your countrymen"; (3) plaintiff overheard coworkers saying "China man" and "rickshaw"; (4) plaintiff heard the phrase "China man" spoken in the context of jokes on several occasions; (5) plaintiff heard co-workers refer to Chinese as "those communists from Beijing"; (6) plaintiff was told by a coworker – "China woman, China woman, China woman, get your butt over here" and was then asked to repeatedly and improperly pronounce "Lima" for other co-workers; and (7) plaintiff saw co-workers on multiple occasions pull their eyes back with their fingers to imitate or mock the appearance of Asians. 339 F.3d at 795–796; *compare Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir.

---

[12] Note, plaintiff began working for defendant in November 2004, but worked "fine" with Branaugh for the first year and a half. Decl. of Efrain Reynaga 2, ECF No. 45. However, "around the end of 2008 [Branaugh] stopped talking to [plaintiff], and [plaintiff] started to find out what type of guy [Branaugh was]." Decl. of Efrain Reynaga 2, ECF No. 45. In fact, Branaugh "asked [plaintiff] several times to go fishing [and] go camping," Decl. of Dan Clark 37, ECF No. 37-2, and they went hunting together a couple of times, Decl. of Dan Clark 9, ECF No. 37-3.

1990),[13] *with Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104 (9th Cir. 1998),[14] *and Nichols*, 256 F.3d at 873.[15] Upon considering these allegations, the Ninth Circuit held that Manatt's allegations were not sufficiently severe and pervasive. *Manatt*, 339 F.3d at 799.

This Court is certainly troubled by plaintiff allegations and recognizes that these events caused plaintiff to suffer pain. However, "when compared to other hostile work environment cases, the events in this case are not severe or pervasive enough to violate Title VII" or § 1981. *Vasquez*, 349 F.3d at 643. Plaintiff's allegations do not rise to the pervasiveness and severity outlined in *Manatt*. If Branuagh's alleged comments, particularly his racial remarks directed at plaintiff that discussed closing the border (#2) and Mexican women (#4), had occurred repeatedly, plaintiff may very well have had an actionable hostile environment claim.[16] However, the conduct alleged by plaintiff is better characterized as reflecting the souring of a work relationship between co-workers; a souring that only acquired a racial overtone towards the end of 2009. *See supra* (footnote 12).[17] Accordingly, plaintiff's hostile work claim must fail and defendant is granted summary judgment as to this claim.

---

[13] In *Sanchez*, the Ninth Circuit held that no reasonable jury could find a hostile work environment existed despite allegations that Sanchez's employer (1) posted a racially offensive cartoon; (2) made racially offensive slurs; (3) targeted Latinos when enforcing rules; (4) provided unsafe vehicles to Latinos; (5) did not provide adequate police backup to Latino officers; and (6) kept illegal personnel files on employees because they were Latino. 936 F.2d at 1031 & 1036.

[14] In *Draper*, the Ninth Circuit found that defendant created a hostile work environment where plaintiff's supervisor made repeated sexual remarks about the plaintiff over a two-year period; (1) plaintiff's supervisor called her "beautiful" and "gorgeous" rather than by her name, (2) he told plaintiff about his sexual fantasies with her, (3) he commented on plaintiff's "ass" several times, (4) he asked over a loudspeaker if plaintiff needed help changing clothes, (5) he required plaintiff to eat lunch with him, and (6) he asked plaintiff, who was of Mexican origin, whether a Mexican prostitute was called a "frijole." 1105-06.

[15] In *Nichols*, plaintiff, who was male, alleged that his co-workers (1) repeatedly referred to him as "she" and "her," (2) mocked him "for walking and carrying his serving tray 'like a woman,'" and (3) taunted him in Spanish and English as a "faggot" and a "fu**ing female whore." 256 F.3d at 870. Plaintiff alleged that these remarks occurred at least once a week and often several times a day between 1991 and 1995. *Id.*

[16] *See, e.g., Brooks*, 229 F.3d at 926 (citations omitted) (internal quotation marks omitted) (noting that "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct.").

[17] Of note, Branuagh was generally known for "picking on people," Pl.'s Resp. to Def.'s Mot. Summ. J. 3, ECF No. 44, and he "screw[ed] with" almost the "whole sawmill," Decl. of Dan Clark 23, ECF No. 37-2. According to

**B. Employer Liability**

Although plaintiff did not meet his prima facie burden above (§ I(A)), a brief assessment of defendant's potential liability remains informative. An employer may be held liable either vicariously, i.e., through the discrimination of a "supervisor," or through negligence, i.e., through the discrimination of a coworker. *See, e.g., McGinest*, 360 F.3d at 1119 (citing *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001)). Because plaintiff concedes that Branuagh was not a supervisor, this Court assesses defendant's liability under negligence. *See, e.g., Nichols*, 256 F.3d at 875; *see also Vance*, 133 S. Ct. at 2443 (defining supervisor in the context of vicarious liability).

An employer is liable "for failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *McGinest*, 360 F.3d at 1119-20 (quoting *Ellison*, 924 F.2d 872, 881 (9th Cir. 1991)). The reasonableness of an employer's remedy depends on the remedy's ability to: (1) "'stop harassment by the person who engaged in harassment;' and (2) 'persuade potential harassers to refrain from unlawful conduct.'" *Nichols*, 256 F.3d at 875 (quoting *Ellison*, 924 F.2d at 882)).

Plaintiff complained about Branaugh orally on October 19, 2009 and by written complaint on December 3, 2009. Pl.'s First Am. Compl. ¶ 31, 33, 95, & 105, ECF No. 22. Although the parties dispute whether plaintiff made racial allegations on October 19, 2009, *see e.g.*, Decl. of Dan Clark 4, ECF No. 37-2,[18] plaintiff's written complaint referred to "acts of discrimination" and a "hostile work environment," Decl. of Efrain Reynaga 1, ECF No. 45-1. As

---

plaintiff, plaintiff and plaintiff's son were the only "Hispanic employee[] among 100 to 150 maintenance employees." Decl. of Efrain Reynaga 2, ECF No. 45.

[18] In response to summary judgment, plaintiff specifies that the "harass[ment]" he reported to defendant "was racist in nature." Decl. of Efrain Reynaga 8, ECF No. 45. After this complaint, defendant's agent (Westbrook) verbally reprimanded Branaugh. Decl. of Marianne Dugan 3–4, ECF No. 47-4.

to this latter complaint, defendant hired Vigilant within one week to investigate the underlying allegations. On December 10, 2009, Vigilant's agent interviewed plaintiff. During this interview, plaintiff referenced Branuagh's comment about closing the border (#2). Mem. in Supp. of Def.'s Mot. for Summ. J. 4, ECF No. 37-1. Vigilant then proceeded to interview a number of other employees. In response to the information that was coming to light, defendant altered Branuagh's work schedule to keep plaintiff and Branuagh as apart as possible, *Id.*,[19] and instructed Branuagh to minimize contact with plaintiff, *id.* at 5; Decl. of Dan Clark 54–55, ECF No. 37-2. Vigilant did not complete a second interview with plaintiff.[20]

Between December 10, 2009 and January 13, 2010, plaintiff alleges only three instances of contact between Branuagh and himself. *See, e.g.*, Decl. of Dan Clark 15, ECF No. 37-2. First, on January 4, 2010, Branugh left a hard-copy of a four page email in the break room purporting to quote a book by Lee Lacocca that included a statement that "our borders are like sieves." Decl. of Efrain Reynaga 3 & 5, ECF No. 45; *id.* at 2, ECF No. 45-2. Second, Branaugh "was at work" when plaintiff arrived. Pl.'s First Am. Compl. ¶ 9, ECF No. 22. Third, on January 13, 2010, Branugh both revved[21] his engine to tease plaintiff and was scheduled to work at the sawmill during the same shift. Decl. of Dan Clark 13, ECF No. 37-2. Plaintiff's reliance on these few discreet acts demonstrates that defendant's actions had in fact stopped Branaugh's harassment in the workplace. *See, e.g., Steiner*, 25 F.3d at 1464 (finding insufficient response

---

[19] Branaugh was transferred to the planer "right after" plaintiff's written complaint. Decl. of Dan Clark 53, ECF No. 37-2. Personnel at the planer and the sawmill shared a parts room and the same warehouse. *Id.* However, the planer and sawmill were two independent buildings separated by a road and plaintiff does not allege any contact while Branaugh was at the planer. *Id.* Plaintiff further alleges that Branuagh was transferred back to the sawmill "sometime in January." *Id.* at 54. At about this time, plaintiff also alleges that he and his son were separated into a crew independent from the other millwrights on the same shift. *Id.* at 55–60.

[20] Defendant argues that "[p]laintiff unreasonably interfered with Defendant's investigation by refusing to be interviewed a second time and walking off the job." Mem. in Supp. of Def.'s Mot. for Summ. J. 4, ECF No. 37-1. Plaintiff argues that he told Dan Johnson, defendant's human resources representative, over the phone that he would participate in a second interview without his lawyer present, but his call was not returned. Pl.'s Resp. to Def.'s Mot. Summ. J. 15, ECF No. 44.

[21] There is no indication that defendant knew of this conduct. *See Ellison*, 924 F.2d at 881 (indicating that employer actual or constructive knowledge of harassment gives rise to employer liability for conduct of coworkers).

where defendant was consistently slow to react and defendant changed plaintiff's shift instead of alleged harasser's shift). Likewise, to the extent that plaintiff left or refused to work because Branuagh was on-site, plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities afforded by defendant. *See, e.g.*, *Faragher*, 524 U.S. at 807. Accordingly, plaintiff has raised no genuine issue of material fact as to whether defendant's corrective actions satisfy its affirmative burden to preclude liability.

## II. Disparate Treatment, Title VII & § 1981

Plaintiff alleges that he was subjected to adverse employment actions in violation of Title VII and § 1981.[22] Plaintiff, in responding to defendant's motion for summary judgment, "may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" defendant. *Metoyer*, 504 F.3d at 931. Plaintiff has not produced direct evidence of discriminatory intent. *See, e.g.*, *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1149 (9th Cir. 1997) (finding that bigoted remarks by a member of senior management may tend to show discrimination); *Vasquez*, 349 F.3d at 640. However, to the extent that plaintiff offers circumstantial evidence – alleged instances of disparate treatment, this Court will utilize the *McDonnell Douglas* framework. *See, e.g.*, *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1030 (9th Cir. 2006) (quoting *McGinest*, 360 F.3d at 1123) ("Under either approach, [plaintiff] must produce some evidence suggesting [defendant's]" proffered rational is pretextual).

---

[22] Title VII and § 1981 claims are both analyzed under the *McDonnell Douglas* framework. *See, e.g.*, *Hawn v. Executive Jet Management, Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010) (applying *McDonnell Douglas* framework to Title VII discrimination claim); *Metoyer v. Chassman*, 504 F.3d 919, 930–31 (9th Cir. 2007) (applying *McDonnell Douglas* framework to § 1981 discrimination claim).

Under the *McDonnell Douglas* framework, plaintiff must demonstrate that: "(1) [he] belongs to a protected class, (2) [he] was performing according to his employer's legitimate expectations, (3) [he] suffered an adverse employment action, and (4) other employees with qualifications similar to [his] own were treated more favorably."[23] *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Because plaintiff's claim focuses on his alleged discriminatory termination and neither party disputes that plaintiff met his burden under the first three prongs with respect to this claim, this Court's inquiry will focus on the fourth prong.[24]

Under the fourth prong, "whether two employees are similarly situated is ordinarily a question of fact." *Hawn*, 615 F.3d at 1157. Generally, "individuals are similarly situated when they have similar jobs and display similar conduct." *Id*. (quoting *Vasquez*, 349 F.3d at 641). If plaintiff can satisfy this fourth prong, "[this Court] presume[s] unlawful discrimination" and then the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment action. *Vasquez*, 349 F.3d at 641. Plaintiff's claim of discriminatory termination fails because, even assuming (which this Court does not decide)[25] that he can make out a prima facie case, he cannot establish that the defendant's articulated non-discriminatory reason for his termination is pretextual.

Defendant proffers two non-retaliatory reasons for termination: plaintiff walked off the job on January 9, 2010 and plaintiff refused to work on January 13, 2010. Def.'s Rep. to Pl.'s

---

[23] A plaintiff may show an inference of discrimination "through comparison to similarly situated individuals, *or* any other circumstances surrounding the adverse employment action [that] give rise to an inference of discrimination." *Hawn*, 615 F.3d at 1156 (emphasis added) (internal quotation marks omitted).

[24] Defendant's concession specifically targets plaintiff's claim for discriminatory termination. *See* Mem. in Supp. of Def.'s Mot. Summ. J. 13, ECF No. 37-1.

[25] Plaintiff's discriminatory termination claim is unlikely to even meet the fourth prong of the *McDonnell Douglas* framework. Plaintiff generally alleges that "defendant treated plaintiff differently from other persons outside his protected class." Pl.'s First Am. Compl. ¶ 73, ECF No. 22. However, plaintiff does not identify any similarly situated employees outside his protected class who were treated more favorably.

Resp. to Def.'s Mot. Summ. J. 12, ECF No. 51. Because these proffered reasons meet

defendant's burden, *see, e.g.*, *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (9th Cir.

1996), the burden then shifts to plaintiff to show that these reasons are pretextual, *Steiner*, 25

F.3d at 1465.

   To meet his burden, plaintiff "must do more than establish a prima facie case and deny

the credibility of the employer's witnesses." *Schuler v. Chronicle Broad. Co.*, 793 F.2d 1010,

1011 (9th Cir. 1986) (citations omitted). Plaintiff "must also offer specific and significantly

probative evidence that the employer's alleged purpose is a pretext for discrimination." *Id*.

Plaintiff, in responding, merely points to his prior allegations to support his general statement

that a reasonable jury could find that his termination was "part of the retaliation and racial

discrimination." Pl.'s Resp. to Def.'s Mot. Summ. J. 17, ECF No. 44; *see also supra* (footnote

25). At no point did plaintiff produce meaningful evidence indicating defendant's proffered

explanations were false or that any supervisor who exercised authority in plaintiff's termination

decision harbored discriminatory animus towards plaintiff. *See Bradley v. Harcourt, Brace and

Co.*, 104 F.3d 267, 270 (9th Cir. 1996). Accordingly, defendant is granted summary judgment as

to plaintiff's discriminatory termination claim. *See, e.g.*, *Godwin*, 150 F.3d at 1222.

   In addition to plaintiff's discriminatory termination claim, plaintiff also generally alleges

other incidents of disparate treatment, including: (1) plaintiff was "denied a company email

account when other mill workers were given one," Pl.'s First Am. Compl. ¶ 42, ECF No. 22; (2)

on November 12, 2008, the "mill" unnecessarily broke his lock during the course of a locker

search for drugs by a police canine unit, *id*. at ¶¶ 18–19; (3) plaintiff "was made to go up and

down stairs" after suffering a broken leg while others were allowed to stay at home with similar

injuries, *id*. at ¶ 45; (4) plaintiff "was told he had to file written reports on repairs when other

millwrights did not have to complete such reports, *id.* at ¶ 43; and (5) plaintiff "was harassed about the time he took to do repairs when others were not harassed for [similar] work," *id.*[26] Upon review, plaintiff has not met his prima facie burden as to these additional allegations.

Plaintiff's first allegation, discriminatory denial of an email account, does not meet his prima facie burden. *See Vasquez*, 249 F.3d at 640 ("[plaintiff] must offer evidence that give[s] rise to an inference of unlawful discrimination") (internal quotation marks omitted). Plaintiff merely alleges that he "was denied a company email account when other millworkers were given one." Pl.'s First Am. Compl. ¶ 42, ECF No. 22. Turning to plaintiff's deposition, Westbrook initially informed plaintiff (and Branaugh) that he was considering setting up an email account for plaintiff to facilitate communication. Decl. of Dan Clark 5–6, ECF No. 37-3. Branaugh objected, informing Westbrook that any communications to plaintiff could go through Branaugh. *Id.* at 6. Despite this objection, plaintiff was given an email account when the matter was re-brought to the attention of a higher level supervisor (Turner). *Id.* at 8.[27] Thus, plaintiff's allegation is insufficient to meet his burden.

Plaintiff's second allegation, discriminatory breaking of his lock, does not meet his prima facie burden. On November 12, 2008, a narcotics task force (DINT) arrived at the mill with drug sniffing dogs. Pl.'s First Am. Compl. ¶ 18, ECF No. 22. During the course of the search, defendant "had [plaintiff's] lock cut off," and DINT searched plaintiff's locker. Statement of

---

[26] As to other allegations of disparate treatment, this Court's analysis *infra* (§ III) precludes plaintiff's claim for discriminatory powerhouse work, discriminatory loss of tailored work detail, and discriminatory composition of crews. *See, e.g., Thompson v. North American Stainless, LP*, 131 S. Ct. 863, 868 (2011) (citations omitted) (finding that Title VII's substantive antidiscrimination provision is more limited in covering employer conduct than Title VII's antiretaliation provision); *Vance*, 133 S. Ct. at 2440 (noting that 42 U.S.C. 2000e–1 prohibits discriminatory employment decisions that have direct economic consequences, such as termination, demotion, and pay cuts). As to plaintiff's allegation of discriminatory full-time conversion, Pl.'s First Am. Compl. ¶ 41, ECF No. 22, plaintiff provides no indication that defendant, i.e. the employer, was responsible for these conversion assignments of unionized employees. *See infra* (§ III). From the information provided, this grievance is more appropriately brought against the union.

[27] Plaintiff provided no evidence that he complained to management about not having an email account prior to his son's complaint to Turner. *See, e.g., Hawn*, 615 F.3d at 1158 (affirming a district court grant of summary judgment where conduct was "not unwelcome" and "never resulted in a complaint").

Scott Albertus 2, ECF No. 47-3. Plaintiff presents little evidence that his locker did not alert the drug sniffing dogs.[28] Rather, plaintiff alleges that the dogs were alerted to Mike Martin's locker, which was not searched, and that Martin received prior notice to clear out his locker. *See* Statement of Scott Albertus 2, ECF No. 47-3; Decl. of Richard Reynaga 1, ECF No. 46; Decl. of Efrain Reynaga 7, ECF No. 45. However, plaintiff's largely unsubstantiated allegations are insufficient to give rise to an inference of unlawful discrimination.[29]

Plaintiff's third allegation, discriminatory imposition of work duties during injury, is insufficient because it is not an adverse employment action and plaintiff did not provide sufficient evidence of similarly situated employees treated more favorably. First, in contrast to being an adverse employment action, defendant provided plaintiff with a monetary benefit— plaintiff was allowed to work light duty[30] in lieu of worker's compensation. Decl. of Dan Clark 24, ECF No. 37-3. Second, defendant was subsequently told to stay on the ground level. *Id*. Third, plaintiff's general comments about two other employee's with injuries not "hav[ing] to go to work" are insufficient to meet plaintiff's prima facie burden. *Id*. at 25.

Plaintiff's fourth allegation, discriminatory imposition of written reports, is not an adverse employment action. *See, e.g.*, *Vance*, 133 S. Ct. at 2440. Turning to the factual context, management assigned plaintiff responsibility for an "upgrade" project on plaintiff's machine. Plaintiff's "written reports" were related to his completion of this upgrade project. In commenting on the project, plaintiff noted that he "had more knowledge of [this particular machine] than any other millwright," his supervisors (Turner and Westbrook) "saw something in

---

[28] Plaintiff merely alleges that "[n]o one from the company told me that the dogs alerted on my locker." Decl. of Efrain Reynaga 7, ECF No. 45. In contrast, Albertus, an employee of defendant, stated that "[o]ne of the dogs went to [plaintiff's] locker." Statement of Scott Albertus 2, ECF No. 47-3.

[29] Plaintiff fails to draw any link between DINT, a governmental narcotics team, and defendant. Likewise, plaintiff provides no meaningful evidence that Martin had similar qualifications and was treated more favorably.

[30] Plaintiff was informed that light duty included "[working] AutoCAD" or "fiddl[ing] around or sit[ting] around in the office, do[ing] nothing, or whatever." Decl. of Dan Clark 24, ECF No. 37-3.

[him] that they liked" and "felt comfortable that [plaintiff] could handle the project," and he was subsequently awarded certificates for his performance. Decl. of Dan Clark 10–11, ECF No. 37-3.

Plaintiff's fifth allegation, discriminatory harassment about repairs, is insufficient to meet plaintiff's prima facie burden. Plaintiff, having been rewarded for his work on the "upgrade" project, generally alleges that Branaugh "harassed [him] that night all night long. [Branaugh] had done it in the past." *Id*. at 13. However, this allegation only focuses on Branaugh, and is far too generic to meet his prima facie burden. *See* 42 U.S.C. § 2000e–2(a) (prohibiting employer discrimination on the basis of "race, color, religion, sex, or national origin"); *see also Vasquez*, 349 F.3d at 640.

Accordingly, defendant is granted summary judgment as to plaintiff's additional allegations of disparate treatment.

### III. Retaliation, Title VII & § 1981

Plaintiff alleges that defendant acted in violation of Title VII and § 1981 by retaliating against him for complaining about Branaugh orally on October 19, 2009 and by written complaint on December 3, 2009. Pl.'s First Am. Compl. ¶ 31, 33, 95, & 105, ECF No. 22. "To make out a prima facie case of retaliation, [plaintiff] must establish that he undertook a protected activity under Title VII, his employer subjected him to an adverse employment action, and there is a causal link between those two events." *Vasquez*, 349 F.3d at 646. If plaintiff meets his prima facie burden, "[t]he burden of production then shifts to [defendant] to advance legitimate, non-retaliatory reasons for any adverse actions taken against [plaintiff]." *Steiner*, 25 F.3d at 1464–65. If defendant meets its own burden, then plaintiff "has the ultimate burden of showing that [defendant's] proffered reasons are pretextual." *Id*. at 1465.

Plaintiff's complaints about Branuagh are a protected activity under Title VII. *See, e.g.*, *Brooks*, 229 F.3d at 928. As to instances of possible retaliatory adverse employment action, plaintiff alleges: (1) on November 26, 2009, plaintiff and plaintiff's son were "required to work at the powerhouse while the five white graveyard millwrights got to stay at a better job," Pl.'s First Am. Compl. ¶ 44, ECF No. 22; (2) on December 30, 2009, defendant converted 16 millwrights from part-time to full-time but did not do so for plaintiff or his son, *id*. at ¶ 41; (3) in January 2010, plaintiff and plaintiff's son "stopped having work orders available . . . they would just have to see what was hanging up on the board for them to do," *id*. at ¶ 46; (4) Branaugh and four other millwrights, composing one crew, received an equivalent level of work as plaintiff and plaintiff's son, a second crew, alone, *id*. at ¶ 40; Decl. of Dan Clark 56, ECF No. 37-2; and (5) on January 18, 2010, plaintiff was terminated, Pl.'s First Am. Compl. ¶ 16, ECF No. 22.[31]

Of this conduct, "[o]nly non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation." *Brooks*, 229 F.3d at 928; *see also Burlington No. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68–69 (2006). Plaintiff's first four alleged instances do not satisfy his prima facie burden.

Plaintiff's first allegation, discriminatory imposition of "powerhouse" duty, does not satisfy his burden because it is trivial[32] and plaintiff did not establish a causal link between this assignment and his initial oral complaint. Moreover, in 2006, Branuagh complained to plaintiff

---

[31] As to other allegations of disparate treatment, plaintiff has failed to provide the "causal link" between these events and plaintiff's October and December complaints. *See* Pl.'s First Am. Compl. ¶¶ 18–19, 27, 35, 42, & 45, ECF No. 22; *see also Villiarimo*, 281 F.3d at 1064–65 (citation omitted) (internal quotation marks omitted) ("To establish causation [plaintiff] must show by a preponderance of the evidence that engaging in the protected activity was one of the reasons for [defendant's adverse employment action] and that but for such activity [plaintiff] would not have been fired.").

[32] Plaintiff does not provide any indication that "powerhouse" duty was an extraordinary work assignment. In contrast, management appears to have assigned "powerhouse" duty fairly regularly. *See, e.g.*, Decl. of Dan Clark 40, ECF No. 37-2 (stating that management looked for volunteers to go to the powerhouse over Christmas 2009).

about being sent to the same powerhouse while plaintiff remained at the saw mill to perform a major upgrade. Decl. of Dan Clark 9–10, ECF No. 37-3.

Plaintiff's second allegation, discriminatory full-time conversion, is insufficient to qualify as an adverse employment action. Plaintiff's causal link must be considered with regard to its factual setting. *Van Asdale v. Int'l Game Tech*, 577 F.3d 989, 1003 (9th Cir. 2009). Plaintiff alleges that he was wrongfully excluded from full-time work conversion on December 30, 2009, in light of his seniority level. Decl. of Dan Clark 1–2, ECF No. 37-3. On December 30, 2009, defendant converted 16 millwrights from a part-time work-share program in which each employee worked 30 hours a week and collected "a little bit" of unemployment to full-time employment. *Id*. at 2. Upon filing grievances with his union, plaintiff was offered both an opportunity to return to work,[33] and 30 hours[34] back-pay. *Id*. at 3. Although plaintiff contests the adequacy of these remedies, plaintiff does not articulate a connection between his protected activities, i.e., his complaints about Branuagh to defendant, and his union's alleged improper decision to fill full-time work positions with millwrights of lesser seniority. *See, e.g.*, *Steiner*, 25 F.3d 1459 (finding an allegation insufficient where plaintiff didn't allege a "concrete connection between" the incident and her complaints against a supervisor).

Plaintiff's third allegation, loss of tailored work detail, also constitutes a trivial change. Plaintiff continued to work as before, but merely prioritized "things to do" based upon a posted "list of things." Decl. of Dan Clark 26, ECF No. 37-3. There is no indication that this change would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Thompson*, 131 S. Ct. at 868.

---

[33] Plaintiff alleges that defendant conditioned his initial return upon plaintiff working weekends to catch up on "about two months" worth of maintenance. Decl. of Dan Clark 3, ECF No. 37-3.

[34] Plaintiff implicitly complains about the sufficiency of 30-hours back pay in his deposition— "That was it, 30 hours." Decl. of Dan Clark 3, ECF No. 37-3. However, plaintiff does not articulate why 30 hours is insufficient. Of note, plaintiff was fired January 18, 2010, i.e., less than three weeks after the conversion.

Plaintiff's fourth allegation, discriminatory composition of crews, is insufficient because plaintiff's supervisor explicitly consulted with plaintiff prior to this crew composition decision and plaintiff did not object. *See* Decl. of Dan Clark 59–60, ECF No. 37-2. Likewise, plaintiff provides no evidence that the "additional responsibilities" associated with this discriminatory composition of crews actually increased the amount of work he performed. *See id.* at 58.

As to the alleged retaliatory termination, plaintiff met his prima facie burden. *See, e.g.*, *Brooks*, 229 F.3d at 928 (citing *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996)) (termination); *see also Villiarimo*, 281 F.3d at 1065 (citations omitted) ("causation can be inferred from timing alone . . . .").[35] In response, defendant offers two non-retaliatory reasons for termination: plaintiff walked off the job on January 9, 2010 and plaintiff refused to work on January 13, 2010. Def.'s Rep. to Pl.'s Resp. to Def.'s Mot. Summ. J. 12, ECF No. 51. Because these proffered reasons meet defendant's burden, the burden then shifts to plaintiff to show that these reasons are pretextual. *See Steiner*, 25 F.3d at 1465.

As in analysis *supra* (§ II), plaintiff "must do more than establish a prima facie case and deny the credibility of the employer's witnesses." *Schuler*, 793 F.2d at 1011 (citations omitted). Plaintiff's unspecified reliance on prior allegations of disparate treatment is insufficient to show that defendant's proffered reasons are pretextual. *See, e.g.*, *Bradley*, 104 F.3d at 270.[36] Accordingly, defendant is granted summary judgment as to plaintiff's retaliation claim. *See, e.g.*, *Godwin*, 150 F.3d at 1222.

## VI. Discrimination Arising under State Law

---

[35] Defendant contests the inference of retaliation based on temporal proximity. However, plaintiff's termination occurred within a month and a half of plaintiff's written, formal complaint. *See, e.g.*, *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding that causation could be inferred where the first adverse employment action took place less than three months after the protected activity).
[36] To the extent that plaintiff generally alleges that management stopped talking to him after filing the December written complaint, his statement is contradicted by his own deposition. *See, e.g.*, Decl. of Dan Clark 59–60, ECF No. 37-2.

In plaintiff's fourth claim for relief, he restates all prior allegations and contends that defendant violated ORS § 659A.030(1)(a)[37] (disparate treatment) and ORS § 659A.030(1)(b)[38] (hostile work environment). Pl.'s First Am. Compl. 15, ¶ 113–15, July 31, 2012, ECF No. 22. Plaintiff's fourth claim, however, doesn't articulate a retaliation violation under ORS § 659A.030(1)(f).[39]

As to plaintiff's stated claims under ORS § 659A.030(1)(a) and (b), this Court uses the same substantive analysis as articulated in Title VII and § 1981 for comparable discrimination claims above (§§ I–II).[40] Accordingly, as in analysis *supra*, defendant is granted summary judgment as to plaintiff's claims arising under state law.

## CONCLUSION

For these reasons, defendant's motion for summary judgment is GRANTED.


IT IS SO ORDERED.

---

[37] ORS § 659A.030(1)(a) provides that it is an "unlawful employment practice":

"(a) For an employer, because of an individuals race, color . . . national origin . . . to bar or discharge the individual from employment. However, discrimination is not an unlawful employment practice if the discrimination results from a bona fide occupational qualification reasonably necessary to the normal operation of the employers business."

[38] ORS § 659A.030(1)(b) provides that it is an "unlawful employment practice":

"(b) For an employer, because of an individuals race, color, . . . national origin . . . to discriminate against the individual in compensation or in terms, conditions or privileges of employment."

[39] If plaintiff had articulated a claim under ORS § 659A.030(1)(f), it would have been assessed using the same substantive framework as articulated in Title VII and § 1981. *See, e.g.*, *Portland State Univ. Chapter of Am. Ass'n of Univ. Professors v. Portland State Univ.*, 352 Or. 697, 712-13 (Or. 2012) (comparing ORS § 659A.030(1)(f) to the Title VII anti-retaliation provision); *Pool v. VanRheen*, 297 F.3d 899, 910 (9th Cir. 2002) (finding that "Or.Rev.Stat. § 659A.030 was modeled after Title VII " and assessing ORS § 659A.030(1)(f) under Title VII case law).

[40] In *Dawson v. Entek Intern.*, 630 F.3d 928, 934 (9th Cir. 2011), the Ninth Circuit held that the *McDonnell Douglas* burden-shifting analysis applied to supplemental Oregon statutory discrimination claims under ORS § 659A.030(1)(a). *See also Henderson v. Jantzen, Inc.*, 79 Or.App. 654, 657 (Or. App. 1986) (explicitly adopting the prima facie requirements articulated in *McDonnell Douglas* for ORS § 659A.030(1)(a)). Likewise, the Ninth Circuit applies Title VII/§ 1981 substantive analysis to hostile work environment claims under ORS § 659A.030(1)(b). *Dawson*, 630 F.3d at 935.

DATED this 12th day of December, 2013.


_____s/ Michael J. McShane_____
Michael J. McShane
United States District Judge